940 So.2d 312 (2004)
Bobby TARVER
v.
STATE of Alabama.
CR-00-2267.
Court of Criminal Appeals of Alabama.
February 27, 2004.
Opinion Concurring in Part and Dissenting in Part From Unpublished Affirmance on Return to Remand November 23, 2005.
Rehearing Denied January 20, 2006.
Certiorari Denied April 21, 2006.
*314 Lajuana Sharonne Davis and Bryan A. Stevenson, Montgomery, for appellant.
William H. Pryor, Jr., atty. gen., and Kristi L. Deason Hagood, asst. atty. gen., for appellee.
William H. Pryor, Jr., and Troy King, attys. gen., and Kristi L. Deason Hagood and Jeremy W. McIntire, asst. attys. gen., for appellee (on return to remand).
Alabama Supreme Court 1050526.
SHAW, Judge.
Bobby Tarver appeals the circuit court's denial of his Rule 32, Ala.R.Crim.P., petition for postconviction relief, in which he attacked his capital-murder conviction and sentence of death.
On September 22, 1982, Tarver was convicted of murder made capital because it was committed during the course of a robbery, a violation of § 13A-5-40(a)(2), Ala. Code 1975; he was sentenced to death. On appeal, this Court reversed Tarver's conviction and sentence on the ground of prosecutorial misconduct. See Tarver v. State, 492 So.2d 328 (Ala.Crim.App.1986). *315 A new trial was held, and on October 20, 1987, Tarver was again convicted of capital murder during a robbery. By a vote of 8-4, the jury recommended a sentence of life imprisonment without the possibility of parole; the trial court overrode the jury's recommendation and sentenced Tarver to death. Tarver's conviction and sentence were affirmed on direct appeal, Tarver v. State, 553 So.2d 631 (Ala.Crim.App.), aff'd, 553 So.2d 633 (Ala.1989), and the United States Supreme Court denied certiorari review, Tarver v. Alabama, 494 U.S. 1090, 110 S.Ct. 1837, 108 L.Ed.2d 966 (1990). This Court issued a certificate of judgment on December 1, 1989. The facts of the crime are summarized in Tarver v. State, 492 So.2d 328 (Ala.Crim.App.1986).
Tarver, through counsel, filed his Rule 32 petition on May 20, 1991, asserting 19 claims. The State filed a response to the petition and requested dismissal of those claims in the petition that were subject to the procedural bars in Rule 32.2 and/or insufficiently pleaded pursuant to Rule 32.3 and Rule 32.6(b). On November 12, 1997, Tarver filed an amended petition; that same day, the circuit court conducted an evidentiary hearing, after which the circuit court allowed the parties to file post-hearing briefs. On April 27, 2000, Tarver filed a brief in support of his Rule 32 petition. On May 2, 2000, the State filed a response to Tarver's amended petition. On June 13, 2001, the circuit court issued a 54-page written order denying Tarver's petition.
On appeal, Tarver raises numerous issues. However, because we must remand this case, we address only three issues at this time.

I.
Tarver contends that the denial of his motion requesting that Judge Ferrill D. McRae recuse himself from ruling on the petition was error. (Issue XIII in Tarver's brief.)
On August 31, 1991, three months after he filed his Rule 32 petition, Tarver filed a motion for Judge McRae to recuse himself.[1] The case action summary reflects that on September 11, 1991, Judge McRae transferred the case to then presiding Judge Braxton Kittrell to rule on the recusal motion, and that on September 25, 1991, Judge Kittrell held a hearing on the motion, after which he denied it. On December 20, 1991, Tarver filed a mandamus petition with this Court requesting that we direct Judge McRae to recuse himself. This Court denied the petition, without an opinion. See Ex parte Tarver, (No. CR-91-411) 595 So.2d 925 (Ala.Crim.App.1991)(table). Although Judge Kittrell's order denying the recusal motion is not contained in the record of the Rule 32 proceedings, it is included in the materials filed with the mandamus petition.[2] In the order, Judge Kittrell found that there was "no basis" for the recusal motion; however, he expressly refused to rule on whether Judge McRae had a "personal bias" that would require recusal; instead, he limited his ruling to the issue whether "there are factual circumstances which would warrant disqualification." The Rule 32 record contains two stipulations *316 from the parties regarding death-penalty cases previously tried by Judge McRae[3] that were offered for consideration in ruling on the recusal motion. However, the transcript of the hearing before Judge Kittrell is not included in the Rule 32 record, nor is it contained in this Court's materials related to the mandamus petition.
"It is the appellant's duty to check the record and to ensure that a complete record is presented on appeal." Jolly v. State, 858 So.2d 305, 309 (Ala. Crim.App.2002).
"`[W]here the appellant fails to include pertinent portions of the proceeding in the record on appeal, this court may not presume a fact not shown by the record and make it a ground for reversal.' Carden v. State, 621 So.2d 342, 345 (Ala. Cr.App.1992). It is the appellant's duty to provide this court with a complete record on appeal, and we will not predicate error on a silent record. See Wilson v. State, 727 So.2d 869 (Ala.Cr.App. 1998)."
Gamble v. State, 791 So.2d 409, 418 (Ala. Crim.App.2000).
"`"It is the appellant's duty to provide this court with a complete record on appeal." McCray v. State, 629 So.2d 729, 733 (Ala.Cr.App.1993); Knight v. State, 621 So.2d 394 (Ala.Cr.App.1993). "This court cannot predicate error on matters not shown by the record, nor can we presume error from a silent record." Stegall v. State, 628 So.2d 1006, 1009 (Ala.Cr.App.1993); Smelcher v. State, 520 So.2d 229 (Ala.Cr.App.1987); Abbott v. State, 494 So.2d 789 (Ala.Cr. App.1986). "Where the record is silent on appeal, it will be presumed that what ought to have been done was not only done, but rightly done." Stegall, 628 So.2d at 1009; Jolly v. State, 405 So.2d 76 (Ala.Cr.App.1981).'"
Rutledge v. State, 745 So.2d 912, 919 (Ala. Crim.App.1999), quoting Jordan v. City of Huntsville, 667 So.2d 153, 155-56 (Ala. Crim.App.1995).
Neither Tarver's allegations in the recusal motion nor the stipulations regarding Judge McRae's previous death-penalty cases are sufficient to establish the necessity for recusal.[4] Therefore, absent a transcript of the hearing on the motion, we cannot say that denial of the motion to recuse was improper.

II.
In his petition, Tarver listed numerous instances he believed evidenced his trial counsel's ineffectiveness. Two of Tarver's allegations of ineffective assistance of trial counsel centered around the alleged failure to present evidence, at both the guilt phase *317 and the penalty phase of the trial, of Tarver's alleged alcohol dependence and mental retardation. Tarver argued that this evidence would have supported his defense at the guilt phase that the shooting was an accident and that he had no intent to kill the victim, and that it would have been compelling evidence of mitigation at the penalty phase.
In its order denying Tarver's petition, the circuit court made extensive and thorough findings of fact regarding Tarver's allegation that his trial counsel was ineffective for not presenting this evidence in mitigation at the penalty phase of the trial. However, the court made no findings of fact regarding Tarver's allegation that his trial counsel was ineffective for not presenting this evidence at the guilt phase of the trial to support his defense. Rather, the court merely noted in a footnote that, had this evidence been presented, the outcome of the guilt phase would not have been different. This general conclusion does not satisfy Rule 32.9(d), Ala. R.Crim.P., which requires a circuit court, in the event an evidentiary hearing is conducted, to "make specific findings of fact relating to each material issue of fact presented"; our review of Tarver's allegation in this regard is hampered by the circuit court's failure to comply with Rule 32.9(d). See, e.g., Ex parte Grau, 791 So.2d 345 (Ala.2000); Holloway v. State, 848 So.2d 1017 (Ala.Crim.App.2002); and Adkins v. State, 930 So.2d 524 (Ala.Crim.App.2001).
Therefore, we must remand this cause for the circuit court to amend its order denying Tarver's Rule 32 petition to include specific findings of fact regarding Tarver's allegation that his trial counsel was ineffective for not presenting evidence of Tarver's alleged alcohol dependence and mental retardation at the guilt phase of his trial to support his defense.

III.
After the circuit court denied Tarver's petition, and while this case was pending in this Court, the United States Supreme Court issued its decision in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). In Atkins, the Court held:
"We are not persuaded that the execution of mentally retarded criminals will measurably advance the deterrent or the retributive purpose of the death penalty. Construing and applying the Eighth Amendment in the light of our `evolving standards of decency,' we therefore conclude that such punishment is excessive and that the Constitution `places a substantive restriction on the State's power to take the life' of a mentally retarded offender. Ford [v. Wainwright], 477 U.S. [399,] 405, 106 S.Ct. 2595 [(1986)]."
536 U.S. at 317, 122 S.Ct. 2242. Based on Atkins, Tarver argues for the first time in a supplemental brief that his death sentence violates the Eighth Amendment prohibition against cruel and unusual punishment because, he alleges, he is mentally retarded. Although this issue was not presented in his Rule 32 petition, in Clemons v. State, [Ms. CR-01-1355, August 29, 2003] ___ So.2d ___ (Ala.Crim.App.2003), this Court held that the decision in Atkins applies retroactively to cases on collateral review, and in Clemons we addressed an Atkins claim that had been raised for the first time on appeal from the denial of a Rule 32 petition. Therefore, this issue is properly before this Court for review.
According to Tarver, the evidence of his mental retardation is undisputed and the trial court has already made a finding that he is mentally retardedin its order sentencing him to death, the trial court found as a nonstatutory mitigating circumstance that Tarver was mentally retarded. Therefore, Tarver requests that this Court *318 vacate his death sentence. In response, the State argues that Tarver's IQ when it was tested in 1995 was 76, above the 70 to 75 range recognized by the Court in Atkins as indicating mental retardation; that Tarver's IQ score of 61 when he was 14 is not reliable because it did not take into account his drug and alcohol abuse; and that the facts of the crime indicate planned behavior inconsistent with mental retardation. Thus, the State concludes, there is no evidence indicating that Tarver is "so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus," and this Court should affirm his death sentence. (State's supplemental brief at p. 17.)
The Rule 32 record contains substantial evidence indicating that Tarver is mentally retarded. The portion of Tarver's school records that was introduced into evidence at the Rule 32 hearing indicate that when he was 14 years old, Tarver had a full-scale IQ of 61, and that when he was 17 years old, he had a full-scale IQ of 72. In addition, two experts, Henry L. Dee, a neuropsychologist, and Harry Albert McClaren, a forensic psychologist, evaluated Tarver for the Rule 32 proceedings; both testified at the Rule 32 hearing that Tarver is mentally retarded. Dr. Dee, who evaluated Tarver in 1995, testified that he administered a battery of tests to Tarver and that he reviewed a variety of documents, and concluded that Tarver had "diffuse" brain damage, meaning that the damage was scattered throughout the brain and not limited to one location, and that Tarver was suffering from "organic syndrome with mixed features," meaning lower than expected mental functioning, significant memory impairment, and other behavioral abnormalities, such as the inability to control his impulses. (R. 74-76.) Dr. Dee testified that Tarver had a full-scale IQ of 76 on the Wechsler Adult Intelligence Scale, falling in the borderline range of intellectual functioning. However, Dr. Dee concluded that Tarver was nevertheless mentally retarded; he testified:
"His performance on the Wechsler scale falls into thewell, what range is kind of controversial. It might be considered either borderline or mentally retarded, depending on two other factors. If you look at what determines retardation practically speaking, it really isn't IQ. It's practical social skills, like can you communicate in a written form, can you hold a job, can you independently exist from other people. In other words, can you maintain an apartment, know how to pay telephone bills and so forth, and so all those are assessed, as well as intellectual functioning. As a practical matter, Mr. Tarver is retarded. Whether you want to call that mildly or moderately is a matter of taste, I think, and definition. That isn't really determined by the IQ per se, but these other areas of adaptive functioning. He is functionally illiterate. He's never lived independently, never had a job for any sustained period of time. Under the criteria for the American Association of Mental Retardation, that constitutes mental retardation, especially when taken in conjunction with a low IQ, which he has."
(R. 66-67.) In addition, Dr. Dee testified that Tarver had a memory quotient of 62, and that the 14-point difference between his IQ and memory quotient indicated cerebral brain damage.
Dr. McClaren, who evaluated Tarver in 1997 at the State's request, testified that his diagnosis was substantially the same as Dr. Dee's. The record suggests that Dr. McClaren also administered an IQ test to Tarver; however, Dr. McClaren did not testify as to what Tarver's numerical IQ *319 score was on that test and the record does not contain any written report prepared by Dr. McClaren. Dr. McClaren merely testified that Tarver's IQ was in "the lower limits of the borderline range of intellect or the upper bounds of the middle range of mental retardation." (R. 146.) Dr. McClaren testified that although Tarver's IQ score fell within the borderline range of intellectual functioning, Tarver had been tested "repeatedly" throughout his life, and, "[t]here's a degree of practice effect" that occurs through repeated testing. (R. 148.) Dr. McClaren testified that despite his numerical IQ being in the borderline range, "[g]iven [Tarver's] poor coping with the demands of independent living," he was of the opinion that Tarver is mildly mentally retarded and suffers from brain dysfunction that appears to go back to at least the age of 14.[5]
The records from Tarver's first and second trials also contain substantial evidence indicating that Tarver is mentally retarded. The presentence investigation reports prepared for both Tarver's first trial and his second trial indicate that Tarver was diagnosed as mentally retarded when he was a child and that he was in special education classes most of the time he was in school;[6] that Tarver suffered from perceptual problems, impulsive and immature behavior, and personality disorders when he was a child; that Tarver's social relationships were "extremely retarded"; that, at the time of the second trial, when Tarver was 27 years old, he was functioning at a first-grade level; that Tarver had never held a regular full-time job; and that he had lived with his mother his entire life and was totally dependent on her for subsistence. (Record of First Trial, C. 386-90; Record of Second Trial, C. 448-55.) In addition, in its sentencing order following the second trial, the trial court found, as a nonstatutory mitigating circumstance, that Tarver was "moderately retarded." (Record of Second Trial, C. 72.)
However, the Rule 32 record also contains a report from the Taylor Hardin Secure Medical Facility, where Tarver was evaluated before his first trial to determine his competency to stand trial as well as his mental state at the time of the offense. That report indicates that there was "no organicity or retardation present." (C. 401.) However, the report does not indicate the basis for this finding, e.g., whether Tarver was administered an IQ test during his evaluation.
The Alabama legislature has not yet enacted legislation enunciating this State's policy on this issue or establishing a procedure for implementing the Atkins decision. However, as this Court recognized in Stallworth v. State, 868 So.2d 1128, 1178 (Ala.Crim.App.2001)(opinion on return to second remand), Alabama does have the "Retarded Defendant Act," § 15-24-1 et seq., Ala.Code 1975, that addresses the placement of mentally retarded individuals before trial. For purposes of the Act, § 15-24-2(3), Ala.Code 1975, defines a mentally retarded person as "[a] person with significant subaverage general intellectual functioning resulting in or associated with concurrent impairments in adaptive behavior and manifested during the developmental period, as measured by appropriate standardized testing instruments." Moreover, in upholding the death *320 sentence in Ex parte Perkins, 851 So.2d 453 (Ala.2002)(opinion on remand from the United States Supreme Court), the Alabama Supreme Court applied the broadest definition of mental retardation recognized in those states that prohibit the execution of the mentally retarded. The Court stated:
"Those states with statutes prohibiting the execution of a mentally retarded defendant require that a defendant, to be considered mentally retarded, must have significantly subaverage intellectual functioning (an IQ of 70 or below), and significant or substantial deficits in adaptive behavior. Additionally, these problems must have manifested themselves during the developmental period (i.e., before the defendant reached age 18)."
851 So.2d at 456.
In upholding the death sentence in Ex parte Perkins, the Alabama Supreme Court found that a full-scale IQ of 76 as an adult was insufficient, by itself, to establish mental retardation. However, the evidence in that case showed that the defendant's intellectual functioning had declined as he aged due to alcohol abuse, and there was no evidence indicating that the defendant had any deficits in his adaptive behavior either before or after the age of 18. Thus, the Court concluded that there was no reason to remand the case for a hearing on the issue. See also Ex parte Smith, [Ms. 1010267, March 14, 2003] ___ So.2d ___ (Ala.2003)(full-scale IQ of 66 at 12 years old with full-scale IQ of 72 as an adult and no evidence of any deficits in adaptive behavior not sufficient to warrant a remand); McGowan v. State, [Ms. CR-95-1775, December 12, 2003] ___ So.2d ___ (Ala.Crim.App.2003)(full-scale IQ of 76 as an adult with no evidence of any deficits in adaptive behavior not sufficient to warrant a remand); Lee v. State, 898 So.2d 790, 809-811 (Ala.Crim.App.2003)(opinion on return to remand)(full-scale IQ of 67 as an adult with evidence suggesting the defendant was malingering and no evidence of any deficits in adaptive behavior before the age of 18 was not sufficient to warrant a remand); Peraita v. State, 897 So.2d 1161 (Ala.Crim.App.2003)(full-scale IQ of 75 as an adult and evidence indicating that defendant was in learning disability classes not sufficient to warrant a remand); Lewis v. State, 889 So.2d 623 (Ala.Crim.App. 2003)(full-scale IQ of 58 as an adult with evidence indicating that defendant was malingering when he took the test and with evidence that defendant had a full-scale IQ of 109 only a few years earlier, and no evidence of any deficits in adaptive behavior before the age of 18 was not sufficient to warrant a remand); and Stallworth v. State, supra (full-scale IQ of 77 as an adult was not sufficient, by itself, to warrant a remand).
In this case, unlike in Ex parte Perkins, the record reflects that Tarver's IQ score has increased as he has aged, and there is testimony by the State's own expert explaining this increase, thus suggesting, contrary to the State's contention in its brief, that Tarver's IQ of 61 when he was 14 is, in fact, the more reliable indicator of Tarver's level of intellectual functioning. Moreover, at the evidentiary hearing both experts alluded to the fact that Tarver had deficits in his adaptive behavior before he reached the age of 18. Although neither went into detail about Tarver's adaptive behavior, both testified that it was their opinion that Tarver was mentally retarded as that term is commonly defined.
Furthermore, in sentencing Tarver to death, the trial court specifically found, as a nonstatutory mitigating circumstance, that Tarver was mentally retarded. Of course, this finding was made *321 years before the United States Supreme Court issued its decision in Atkins and without the benefit of the United States Supreme Court's guidelines in that case, see Atkins, 536 U.S. at 308 n. 3, 122 S.Ct. 2242, or the Alabama Supreme Court's guidelines in Ex parte Perkins. Therefore, we cannot, as Tarver urges us to, treat this finding as conclusive with respect to whether Tarver's death sentence violates the Eighth Amendment under Atkins. It is, instead, another factor to be considered in making the determination whether Tarver is mentally retarded.
This Court, however, cannot determine whether Tarver is mentally retarded based on the records before us, which contain conflicting evidence regarding Tarver's mental retardation. See Clemons, supra. Although the Rule 32 record and the records from Tarver's first and second trials contain substantial and compelling evidence indicating that Tarver is mentally retarded, they also contain some evidence suggesting that he is not. The records before this Court are simply not sufficient to allow us to determine whether Tarver is mentally retarded.
Therefore, under the circumstances in this case, we must remand this cause for the circuit court to determine whether Tarver is mentally retarded and, thus, whether his death sentence violates the Eighth Amendment, and to issue specific written findings of fact in this regard. On remand, the circuit court shall conduct an evidentiary hearing and shall allow the parties to present any further evidence regarding Tarver's intellectual functioning and adaptive behavior that may aid it in making its determination, as well as any other evidence the court deems relevant to this issue. In determining whether Tarver is mentally retarded, the court should consider the definition of mental retardation in § 15-24-2(3), Ala.Code 1975, as well as the guidelines set forth in Atkins and Ex parte Perkins. If the court determines that Tarver is mentally retarded, it shall vacate Tarver's death sentence and resentence him to life imprisonment without the possibility of parole.
For the reasons stated above, this cause is remanded for the circuit court (1) to issue specific written findings of fact regarding Tarver's allegation that his trial counsel was ineffective for not presenting evidence of his mental retardation and his alleged alcohol dependence at the guilt phase of the trial, and (2) to determine whether Tarver is in fact mentally retarded and to issue specific written findings of fact in that regard. Due return shall be filed with this Court no later than 98 days from the date of this opinion. We pretermit discussion of Tarver's remaining issues pending the circuit court's return to our remand.
REMANDED WITH DIRECTIONS.
McMILLAN, P.J., and COBB, BASCHAB, and WISE, JJ., concur.

On Return to Remand
SHAW, Judge.
AFFIRMED BY UNPUBLISHED MEMORANDUM.
McMILLAN, P.J., and BASCHAB and WISE, JJ., concur.
COBB, J., concurs in part and dissents in part, with opinion.
COBB, Judge, concurring in part and dissenting in part.
In its unpublished memorandum, the majority affirms on return to remand the circuit court's denial of Bobby Tarver's Rule 32, Ala. R.App. P., petition, challenging his 1982 conviction and death sentence. I concur as to Part I of the memorandum, which affirms the trial court's denial of *322 claims based on procedural bars. I dissent as to Part II of the memorandum, which upholds the trial court's finding that Tarver is not mentally retarded. While I concur in the result the majority has reached as to the remaining issues, I write specially because I do not agree with all of the majority's analysis.

I.
The majority holds that many of Tarver's allegations of ineffective assistance of counsel were not sufficiently pleaded and that the allegations were properly denied because Tarver failed to comply with the pleading requirements of Rule 32.3 and Rule 32.6(b), Ala. R.Crim. P. Rule 32.6(b) states that "[t]he petition must contain a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds. A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings." I do not agree with the majority with regard to each of its determinations regarding insufficient pleading.
Certainly Rule 32.6(b) requires a specific statement of grounds and full disclosure of the factual basis, but the pleading requirements of Rule 32 need not be so strictly construed that they be used to dismiss claims that can be understood from a fair reading of the petition. I believe that the majority has so construed the pleading requirements in this case.
For example, in Part III.K. of its unpublished memorandum, the majority holds that Tarver failed to plead with sufficient specificity his allegation that trial counsel was ineffective for failing to object to the trial court's consideration of certain allegedly prejudicial information in the presentence report, and he incorporates Claim I of the petition. The majority states that Tarver made only bare allegations that failed to identify the prejudicial statements and that these allegations were not sufficient to satisfy a Rule 32 petitioner's burden of pleading. Claim I of the petition includes the allegation, "The presentence report included hearsay remarks about Mr. Tarver's reputation in the community which were attributed to no one. Mr. Tarver could never effectively confront these hearsay allegations because the persons who gave the information were anonymous." That portion of the petition contained enough information to ascertain the basis of Tarver's claim. Tarver alleged that trial counsel should have objected to the portion of the presentence report addressing Tarver's reputation in the community because, he says, it contained anonymous hearsay statements. Only by quoting the objectionable statements could Tarver have provided more detail to the claim. Nothing in Alabama law requires a petitioner to quote each portion of the record that supports his claim. To hold that this allegation was not sufficiently pleaded requires the petitioner to far surpass the requirement of Rule 32.6(b), Ala. R.Crim. P.
Although I believe that the majority has, in some instances, required more specific pleading than Rule 32 contemplated, I nonetheless concur with the result reached by the majority on that issue because Tarver failed to plead or prove prejudice as to the claims. For example, as to Claim I of the petition discussed above, Tarver failed to prove that the hearsay in the presentence report resulted in any prejudice to him; Alabama law specifically allows hearsay to be presented in presentence reports and to be considered by the court in imposing sentence. See McWhorter v. State, 781 So.2d 257, 326 (Ala.Crim.App.1999), aff'd, 781 So.2d 330 (Ala.2000). Although I am concerned that this Court has in some *323 instances interpreted the pleading requirements more stringently than they were intended, I do not disagree with the majority's determination that most of the claims of ineffective assistance of counsel were due to be denied.

II.
In Part II of its unpublished memorandum, the majority upholds the trial court's determination, based on its resolution of the conflicting evidence of Tarver's alleged mental retardation, that Tarver was not so mentally impaired as to fall within the range of mentally retarded offenders who are ineligible for the death penalty under Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). Based on the record before this Court, I can only conclude that the trial court abused its discretion in making this finding. The trial court's finding is not supported by the wealth of evidence gathered over a period of years that establishes that Tarver is mentally retarded.
In our opinion remanding this case, we noted that, in the sentencing order it issued following Tarver's second trial, the trial court found as a nonstatutory mitigating circumstance that Tarver was moderately retarded. Tarver v. State, 940 So.2d 312, 326 (Ala.Crim.App.2004). Furthermore, we stated, "The Rule 32 record contains substantial evidence indicating that Tarver is mentally retarded," and we detailed much of the evidence and testimony presented at the Rule 32 hearing to support that statement, including IQ test scores and the testimony of Dr. Henry Dee, a neuropsychologist, and Dr. Harry McClaren, a psychologist. 940 So.2d at 318. We further stated, "The records from Tarver's first and second trials also contain substantial evidence indicating that Tarver is mentally retarded. The presentence investigation reports prepared for both Tarver's first trial and his second trial indicate that Tarver was diagnosed as mentally retarded when he was a child and that he was in special education classes most of the time he was in school." Tarver v. State, 940 So.2d at 319 (footnote omitted). Because the record also contained some evidence indicating that Tarver was not mentally retarded, however, we remanded the cause for a hearing and factual findings.
In its unpublished memorandum, the majority states that the evidence presented at the hearing held following this Court's order of remand did not resolve the question of Tarver's intellectual abilities. The majority stated:
"That evidence did not dispel the conflict that existed regarding Tarver's alleged mental retardation; the evidence remains conflicting as to both Tarver's level of intellectual functioning and his adaptive functioning. The evidence indicates that Tarver has been administered six IQ tests in his life; three times he had a full-scale IQ score below 70 (once he had a 59 and twice a 61), and three times he had a full-scale IQ score above 70 (72, 74, and 76). Likewise, the evidence of Tarver's adaptive functioning skills is conflicting."
The majority then quotes from the trial court order and adopts the court's findings of fact as its own; one of the findings the trial court made was that Tarver was malingering when he was tested twice by a psychologist before the 2004 hearing and scored a full-scale IQ of 59 and then 61. The quoted portion of the trial court's order disregards significant portions of the relevant evidence presented on remand. Therefore, I have set forth in detail below some of the relevant testimony presented at the hearing.

*324 A.
At the hearing on remand, Dr. Glen King, a clinical and forensic psychologist[1] who is also a practicing attorney, testified that he performs mental retardation evaluations every day and on an average of 15-to-20 times per week and that he has been performing these kinds of evaluations for at least 30 years. (R.H. 22-23.)[2] Dr. King testified that he was retained by the Alabama Attorney General's Office to evaluate Tarver. Specifically, he was asked to review information from the previous trials and also to review Tarver's previous psychological evaluations, medical records, and records from the Department of Corrections. Dr. King evaluated Tarver on May 5, 2004, and again on June 24, 2004. (R.H. 26.) During the first evaluation, Dr. King conducted a "a standard clinical interview" with Tarver, and he administered the Wechsler Adult Intelligence Scale, Third Edition ("WAIS-III"), the Independent Living Scales ("ILS"), and the Wide Range Achievement Test ("WRAT") to assess Tarver's "ability to read and write and do arithmetic." (R.H. 27.) Dr. King's evaluation revealed that Tarver is mentally retarded. Dr. King testified that Tarver achieved a full-scale IQ score of 59, "which places him in the lowest one percent of the population and at the lower end of the mild range of mental retardation. . . ." (R.H. 27-28.)[3] Tarver functioned at the first-grade level in reading, spelling, and arithmetic. (R.H. 69.) According to Dr. King, Tarver is illiterate. (R.H. 69.) He explained that a person who reads at the first-grade level is merely recognizing words and has no concept of understanding "if you start stringing two or three or four [words] together." (R.H. 71.)
Dr. King testified that the ILS measures a person's "ability to live independently, and it measures adaptive functioning in a number of different domains," including health and safety, money management, social adjustment, and problem solving. (R.H. 28-29.) He testified as follows about Tarver's results on the ILS:
"He scored low across the board, and he did a little bit better in social adjustment, meaning that he hasand that simply is going to measure things like do you have some friendships in prison. If he does that, he's not totally withdrawn. But he did extremely poorly in memory and orientation, managing money, health and safety issues, and his full scale standard score was at 55 with an average being a hundred. So he was well below *325 average. In fact, it was off the bottom of the chart."
(R.H. 30.)
Dr. King testified that he evaluated Tarver a second time a few weeks after he had completed his first evaluation. He explained that he had met with a deputy attorney general and had reviewed the results of the first evaluation. They noted the discrepancy between the results Dr. King obtained and the results previous examiners had obtained. Dr. King testified:
"It raised an issue in my mind about whether there had been some faking, malingering of outcome, or whether something else had occurred that could cause this discrepancy.
"So I thought that it would be most prudent to go back and see him and do a second administration of the same test looking to see if he was able to provide a consistent set of responses across two administrations. And I also administered a different adaptive behavior scale that second time as well as a specific test to look at the possibility of malingering from memory difficulties."
(R.H. 31.)
Dr. King testified that Tarver's performance on the second administration of the WAIS-III resulted in a full-scale IQ of 60 or 61, which was not significantly different from the first score of 59. Dr. King also stated:
"But what I was really looking for, the IQ score to me was not as important as the fact that he basically generated, in my opinion, the exact same results on each one of the subtests, and there were 11 of them on both administrations. The difference in his responses were minuscule, and that internal consistency gives me a great deal of confidence that the first assessment I did was accurate."
(R.H. 32.)(Emphasis added.) Dr. King noted that one subtest of the WAIS-III, the coding subtest, requires the examinee to copy symbols from a grid in a two-minute period and is sometimes used to detect malingering. Dr. King testified that Tarver's performance on the first and second administrations of this subtest was "extremely consistent and I think again indicates that he was giving his best performance on both administrations of the test." (R.H. 32.)
During the second evaluation, Dr. King administered a second measure of adaptive behavior and determined that Tarver functioned adaptively at a very low level "in all areas except what you might call kind of street savvy behavior." (R.H. 33.) Dr. King explained Tarver's level of adaptive functioning: "[I]f he could find his way around town he could do some jobs as long as they were labor intensive and didn't require any literacy skills, things of that nature." (R.H. 33-34.) Dr. King did not interview third parties, such as family members, because, he stated, in his professional experience he has not found third-party interviews to be very helpful, particularly because Tarver had been in prison for 20 years. (R.H. 43.)
Dr. King administered a test designed to identify malingering. After explaining the details of the test and noting that many people find the task to be very difficult, Dr. King testified:
"We know that individuals who are extremely mentally retarded and who have brain damage and who are mentally ill don't have any difficulty with that task. In other words, they typically will still get 46 to 50 right on every trial.
"Mr. Tarver had 50 right on every trial. In other words, he made no mistakes throughout the entire presentation. And that, again is an indication to me of a straightforward approach to the *326 testing situation and no attempt to malinger. He wasn't faking anything."
(R.H. 35-36.)
Finally, Dr. King testified that he was confident that the test results he obtained accurately reflected Tarver's level of intelligence and adaptive functioning. He stated:
"And if I might add, I particularly feel that way because I also reviewed previous records and I think that my IQ findings, intelligence findings, are consistent with what I see from previous score records, especially a Wechsler Intelligence Scale for Children that was done. Very early in his life he generated an IQ of 61. And because I got these consistent results across two presentations and I was really looking to see if he was trying to fake on the test results and they're exactly what I would expect from somebody who is, in fact, mentally retarded."
(R.H. 36.)
Dr. Henry Dee, a neuropsychologist who has testified in court as an expert on mental retardation (R.H. 99), conducted a neuropsychological evaluation of Tarver in 1995 and testified at Tarver's trial in 1997. He testified again at the hearing on remand, but had not conducted any further evaluations of Tarver before he testified. Dr. Dee had not been "specifically asked to do an evaluation regarding mental retardation." (R.H. 88.) However, because he administered portions of the version of the Wechsler IQ test then being used, the Wechsler Adult Intelligence Scale-Revised ("WAIS-R"), Dr. Dee testified that, during his evaluation of Tarver, he had determined that Tarver met the criteria for mental retardation. Dr. Dee acknowledged that, when he gave a portion of the WAIS-R to Tarver, Tarver achieved a full-scale IQ score of 76 and that, when Tarver was evaluated in 1997 by Dr. McClaren, a psychologist, he achieved a similar full-scale IQ score.[4] When asked to explain why the results obtained in those evaluations could be so different from the scores obtained by Dr. King, Dr. Dee testified:
"Oh, I think it's relatively straightforward. One of the reasons that the Wechsler, the WAIS-R, was re-standardized was that it was found to be insensitive at the lower end. In other words, it didn't identify an adequate number of people [who are] functioning at a low level. It was not felt to be adequately sensitive so that among other things, that was one of the motives for reconstituting the test into the test that is now used, the WAIS-3.
". . . .
"And they also note that probably every decade or so the main score on an IQ test increases by about three points. So all those things considered, you would expect a need for a re-standardization every 10 to 15 to 20 years depending on your particular tests."
(R.H. 91-92.) Dr. Dee stated that, when he administered the WAIS-R to Tarver, the test "had basically ended the era of its usefulness and the WAIS-III was replacing it." (R.H. 94.) Dr. Dee stated that he did not administer the WAIS-III to Tarver before he testified at the hearing on remand, but, he stated, "I would think that the WAIS-III would be an accurate reflection of his current level of mental functioning." (R.H. 93.) Dr. Dee also stated that the WAIS-III, the test Dr. King administered, and the WAIS-R, the test he had administered, were different tests that could yield slightly different results. He noted, too, that the WAIS-III had a few *327 different subtests than the WAIS-R. (R.H. 93.) Dr. Dee testified that he remained convinced that Tarver was mentally retarded. He stated:
"In fact, if anything, Dr. King's results seem to bolster that since he's using actually probably a better test than I was using back in '94 or '95, in other words, seemed to have more validity. Because as I said, the WAIS-R was outliving its lifespan in a sense at that point."
(R.H. 105.)
Dr. Dee testified that, when he evaluated Tarver, he determined that Tarver suffered from deficits in his adaptive functioning. Dr. Dee recalled some of the deficits he had given in his previous testimony:
"Some of the things that I do remember specifically [were] that he had never been employed for a substantial period of time in a particular trade. He lived at home his entire life. He didn't take care of his own bills and finances. His mother did that. In other words, he had never really lived independently, and he was illiterate, had never learned to read and write. He had been to special education."
(R.H. 101.)
Dr. Dee stated that he had not seen Tarver in 10 years and that he might have gained some limited reading skills, but that he had asked Tarver to read during the 1995 evaluation and he could not read "at an acceptably adult level" at that time. (R.H. 123.) Dr. Dee was asked, in light of his determination that Tarver was illiterate, what he would say if, hypothetically, a witness said he saw Tarver reading a newspaper. He testified that Tarver "might even mimic reading the newspaper if somebody went around, like looking at the pictures, the sports page or something like that." (R.H. 103.) Dr. Dee had no evidence that Tarver was malingering. In fact, Dr. Dee testified, his impression was that Tarver did not want to be seen as being impaired, and he put forth his best effort during testing. (R.H. 139.)
Dr. Dee testified that, even though Tarver obtained an IQ score of 76 when he administered portions of the WAIS-R to Tarver, it was his opinion that Tarver was mentally retarded. He explained that the diagnosis of mental retardation in the then current version of the Diagnostic and Statistical Manual published by the American Psychiatric Association required a diagnosis before age 18, significant deficits in adaptive functioning and, he quoted, "`an IQ of 70 to 75 or so.'" (R.H. 89.) He said that Tarver had been tested several times and that his score of 76 might have been the result of a practice effect and slightly artificially elevated. (R.H. 136.)
Dr. McClaren, a psychologist, testified at the hearing that, when he evaluated Tarver in 1997, Tarver achieved a full-scale IQ of 74. He testified at Tarver's initial hearing on his postconviction petition that Tarver was functioning in the range of mild mental retardation. (R. 148.) Dr. McClaren did not administer any tests in 1997 to evaluate Tarver's level of adaptive functioning, and he testified that he was not familiar with the ILS test. (R.H. 172.) Dr. McClaren testified that Tarver was illiterate and he functioned only at first- and second-grade levels in reading recognition, spelling, and arithmetic.[5] However, Dr. McClaren could not *328 testify that Tarver was mentally retarded. (R.H. 184.) He stated there was a 90-percent probability that Tarver's IQ score was above 70. (R.H. 170.) Dr. McClaren also testified that there was "a possibility" that Tarver was retarded and that he could not "outright deny" that he was. (R.H. 209.) He explained the change in his 1997 diagnosis by stating that, after he evaluated Tarver and found him to be of borderline intelligence or mentally retarded, he thereafter gained more experience in assessing mental retardation. (R.H. 198.) Finally, Dr. McClaren testified that he had no proof that Tarver had malingered on any tests of adaptive functioning or on any of the IQ tests administered by him, by Dr. Dee, or by Dr. King. (R.H. 188, 189, 191, 192.)

B.
The majority has correctly stated that, when disputed facts are presented at a postconviction proceeding, the circuit court resolves those factual disputes and this Court reviews the denial of the petition only for an abuse of discretion. I am compelled to find that, in this case, the trial court abused its discretion in making many of its factual findings, and particularly when it rejected the testimony of Dr. King as "`simply incredible in light of both Dr. Dee's and Dr. McClaren's testimony and the other evidence presented,'" and when it found that the "only logical conclusion" for the decrease in Tarver's IQ after he was tested by Dr. Dee and Dr. McClaren was that Tarver malingered on Dr. King's tests. Tarver v. State, ___ So.2d at ___. There is no support for these findings, or for many of the other findings the trial court made and that the majority today adopts. Thus, for the reasons expressed below, I believe that the trial court has abused its discretion in making its factual findings and that its ruling should be overturned.
First, I can only conclude that the trial court abused its discretion when it found Dr. King's testimony to be "`simply incredible'" and when it found that Tarver malingered on Dr. King's tests. No expert, at any stage of the proceedings, has ever testified that Tarver has malingered. To the contrary, Dr. Dee and Dr. McClaren testified that they saw no evidence of malingering when they tested Tarver, and they could not state that Tarver malingered during Dr. King's evaluation. More importantly, Dr. King, the only psychologist who evaluated Tarver before the hearing on remand, tested Tarver twice; Dr. King conducted the second evaluation specifically to determine whether Tarver was malingering, because the results from the first evaluation were dissimilar from the results Dr. Dee and Dr. McClaren had obtained earlier. Dr. King explained that, based on the consistency of Tarver's performance and based on Tarver's performance on tests used to detect malingering, he was confident that Tarver had put forth his best effort and that he was, in fact, mentally retarded. Furthermore, Dr. King's determination that Tarver was mentally retarded was based in part on his review of Tarver's records, which included *329 previous IQ scores and school records indicating that Tarver was mentally retarded. Dr. King's professional credentials, his decades of experience in evaluating clients to determine whether they were mentally retarded, and the fact that he conducted the most recent evaluations of Tarver were factors the trial court dismissed when it rejected Dr. King's testimony and determined, without any support in the evidence, that Tarver was malingering. Thus, the trial court abused its discretion when it found Dr. King's testimony to be "simply incredible" and when it determined, in light of all the testimony to the contrary, that Tarver was malingering on Dr. King's tests and that there is "`no doubt that Tarver's IQ lies in the mid 70's.'" Tarver v. State, ___ So.2d at ___. Dr. Dee testified at the initial hearing and at the hearing on remand that Tarver is mentally retarded. He testified that his confidence in that diagnosis was enhanced by Dr. King's more recent evaluations of Tarver. The trial court implicitly rejected Dr. Dee's expert opinion that Tarver is mentally retarded although the court relied on and accepted a single element of Dr. Dee's 1995 evaluation of Tarverthe finding that Tarver's full-scale IQ was 76. When it rejected Dr. King's opinion, the court noted that Dr. Dee's results were similar to the results Dr. McClaren had obtained, and the court relied on that score as support for its determination that Dr. King's testimony was "simply incredible." And yet the trial court rejected Dr. Dee's determination that Tarver was mentally retarded. The trial court relied on the one item in Dr. Dee's evaluation that it found supportive of its conclusionthe IQ score.
Following his evaluation of Tarver in 1997, Dr. McClaren determined that Tarver was illiterate and mildly mentally retarded. At the Rule 32 hearing, Dr. McClaren testified:
"I mean while the scores that Dr. Dee and I got technically fall within the borderline range, he's been tested repeatedly. There's a degree of practice effect. I think all things considered, given his poor coping with demands of independent living at the time that he was free, makes me think that he's mildly retarded."
(R. 148.)
Yet, without conducting any interviews or any additional evaluation of Tarver before the hearing on remand, Dr. McClaren testified that he had come to believe that Tarver was actually functioning in the borderline range of intelligence. The only reason Dr. McClaren gave for his change of opinion from the one he gave at the 1997 hearing was that, as a result of "the experiences of doing assessments on people after the [Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002),] decision, I think I have a better understanding of the diagnosis of mental retardation than I did in 1997." (R.H. 198.) Dr. McClaren continued to acknowledge, however, that "it is a possibility" that Tarver is mentally retarded. (R.H. 209.)
In light of Dr. King's clinical and professional experience and his two very recent evaluations of Tarver, the second evaluation specifically focused on detecting any potential malingering by Tarver, I find it to be an abuse of the trial court's discretion to base its decision almost solely on Dr. McClaren's testimony at the hearing on remandtestimony that was completely at odds with his earlier testimony and that was based only on his vague post-Atkins "better understanding" of a diagnosis of mental retardation and his reconsideration of his data from years earlier.
Based on the entire record, which includes numerous determinations by qualified professionals that Tarver's level of intellectual functioning is significantly subaverage, *330 the trial court's conclusion that there is "no doubt that Tarver's IQ lies in the mid 70's" constitutes a gross abuse of discretion.

C.
The trial court also rejected substantial testimony regarding Tarver's deficits in adaptive functioning and concluded that Tarver did not have "the requisite deficits" necessary to support a diagnosis of mental retardation. This determination, too, constitutes an abuse of discretion.
Every expert who examined Tarver and testified during the Rule 32 proceedings has determined that Tarver suffers from significant deficits in his adaptive functioning. Even Dr. McClaren, who had a post-Atkins change of opinion as to his interpretation of the results from Tarver's prior IQ test, did not testify to the contrary at the remand hearing. Dr. Dee and Dr. King testified at length about Tarver's deficits. Nonetheless, the trial court dismissed the experts' opinions. The trial court finds fault with Dr. Dee's and Dr. King's failure to conduct "`independent testing of adaptive behavior.'" Tarver v. State, ___ So.2d at ___. The trial court also noted that Dr. Dee and Dr. King failed to interview Tarver's schoolteachers, his family members, his employers, or any correctional officers.[6] While it is true that Dr. Dee and Dr. King did not conduct such interviews, it is patently untrue that no "independent testing" was conducted. Dr. King testified that he administered two tests of adaptive functioning, the ILS test and the Adaptive Behavior Systems Assessment, and that the tests revealed that Tarver suffered from significant deficits in adaptive behavior on both tests. Furthermore, Dr. Dee and Dr. King both explained the reasons they did not interview third-party sources. Dr. King testified that, in his professional experience, he has not found third-party interviews to be very helpful, particularly in view of the fact that Tarver had been in prison for 20 years. (R.H. 43.)
In spite of the fact that every expert who examined Tarver and who testified at the Rule 32 hearings determined that Tarver was functionally illiterate, the trial court stated that "`other evidence was introduced that cast doubt on the extent of Tarver's illiteracy.'" Tarver v. State, ___ So.2d at ___. The trial court noted that, at the hearing on remand, a prison guard testified that he had observed Tarver reading the sports page in a newspaper and that Tarver could read and write simple notes. Dr. King, Dr. Dee, and Dr. McClaren testified that Tarver reads at the first- or second-grade level, but that, because he does not read at a functional adult level, he is functionally illiterate. Dr. Dee testified that Tarver "might even mimic reading the newspaper if somebody went around, like looking at the pictures, the sports page or something like that." (R.H. 103.) The trial court's rejection of all expert testimony about Tarver's illiteracy and his substantial deficits in adaptive functioning constitutes another abuse of discretion.
The trial court's finding that Tarver did not establish any significant limitations in adaptive behavior other than in academics directly conflicts with all of the experts' testimony. The fact that Tarver held odd jobs and gave his money to his mother and that, in prison, Tarver looks at the sports page, reads and writes simple notes, and delivers items from the canteen does not *331 undermine the experts' conclusions regarding Tarver's adaptive functioning. The trial court's piecing together of selected bits of information to discredit the experts' consistent opinions regarding Tarver's deficits in adaptive functioning constitutes an abuse of discretion.

Conclusion
Although I have failed to address all of the trial court's findings that, in my opinion, constitute an abuse of its discretion, I have discussed in detail some of what I consider the more glaring ones. The records from Tarver's trials, which include repeated findings of Tarver's mental retardation; the substantial evidence of mental retardation presented at the Rule 32 hearing, as detailed in this Court's initial opinion remanding the cause for a hearing; and the extensive testimony at the remand hearing about Tarver's intellectual and adaptive-skill deficits have convinced me that the trial court's findings are outside the broad range of discretion and cannot stand. Tarver's death sentence violates Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), and constitutes cruel and unusual punishment. Tarver's death sentence should be overturned by this Court; if this death sentence is not overturned by an Alabama Court, I am convinced that the Alabama Supreme Court or a federal court will do so during the proceedings that will inevitably follow. Therefore, I am compelled to dissent as to Part II of the unpublished memorandum.
NOTES
[1] In the motion, Tarver argued that recusal was required because, he said: (1) Judge McRae has a history of adopting the State's proposed orders in collateral proceedings in death-penalty cases; (2) Judge McRae has a "predisposition" to sentence capital defendants to death; and (3) Judge McRae indicated at the sentencing hearing and in his sentencing order that Tarver's version of the crime was a lie. (C. 116-26.)
[2] This Court may take judicial notice of its own records. See, e.g., Hull v. State, 607 So.2d 369, 371 n. 1 (Ala.Crim.App.1992).
[3] One stipulation is a list of cases heard by Judge McRae in which the defendants were convicted of capital murder; the stipulation includes the name of the case, the jury's sentencing recommendation, and Judge McRae's sentence. The second stipulation indicates that the presiding circuit judge in the Thirteenth Judicial Circuit is the person responsible for assigning cases, and it contains a list indicating who the presiding judge was at the time each capital-murder case was assigned to Judge McRae.
[4] Tarver also argues on appeal that recusal was necessary because the State had an ex parte communication with Judge McRae before the hearing on the recusal motion. Because the basis for this claim did not arise until after Tarver filed his motion to recuse, this claim obviously was not included in the motion. In addition, because a transcript of the hearing on the recusal motion is not contained in the record, we have no way of knowing whether this claim was presented to the trial court at that time. Based on the record before this Court, this claim is being raised for the first time on appeal and cannot be considered.
[5] Neither Dr. McClaren nor Dr. Dee testified as to the cause of Tarver's brain damage. However, there is some indication in the record that Tarver suffered a head injury at the age of 14 that may have caused, or contributed to, the brain damage.
[6] The reports reference the same school records that were introduced into evidence at the Rule 32 hearing.
[1] Dr. King's vita indicates that, in 1979, he was designated a diplomate in clinical psychology by the American Board of Professional Psychology (ABPP). According to ABPP's Web site, "Board certification (awarding of a Diploma in a specialty) assures the public that specialists designated by the ABPP have successfully completed the educational, training, and experience requirements of the specialty, including an examination designed to assess the competencies required to provide quality services in that specialty." www.abpp.org/abpp_public_about.htm (as visited on November 23, 2005, and available in the office of the clerk of the Alabama Court of Criminal Appeals).
[2] Pages from the transcript of the July 22, 2004, remand hearing will be designated "R.H. ___."
[3] Dr. King testified that the WAIS-III is the third version of the Wechsler Adult Intelligence Scale. He stated that the original WAIS was "a little easier than the WAIS-R," which was the second version of the WAIS, and that the WAIS-R was "a little easier" than the third version, the WAIS-III. (R.H. 37.) He also testified that many clinicians believe that a person's score on the WAIS-III would be seven points lower than the score he would have obtained on the original WAIS. (R.H. 38.)
[4] Dr. Dee noted that Dr. McClaren evaluated Tarver before his second trial and determined that he was mentally retarded. (R.H. 135-36.)
[5] I find it interesting that, in spite of Dr. McClaren's determination that Tarver was illiterate and able to read at only the first- or second-grade level, Dr. McClaren administered the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2"), which Dr. McClaren described as "a long series of statements that a person reads and decides if they are true or false, apply to them. Mostly true, mostly false, usually true, usually false." (R.H. 177-78.)(Emphasis added.) Dr. McClaren testified that Tarver's test was "technically invalid" because the score on one of the scales that measures validity and truthfulness in the test-taking was too high. A high score on the scale indicated that Tarver was endorsing all kinds of psychopathology and might have been answering questions randomly, Dr. McClaren said. However, the Web site for Pearson Assessments, the licensed representative that sells and scores MMPI test products, indicates in its "Quick Facts" section that a sixth-grade reading level is required to take the MMPI-2. www.pearson assessments.com/tests/mmpi_2.htm (as visited on November 23, 2005, and available in the office of the clerk of the Alabama Court of Criminal Appeals).
[6] Dr. McClaren also did not conduct any such interviews, yet he testified at the initial hearing that Tarver did not have adequate skills to meet the demands of independent living. (R. 148.)